at all, Southern Health Partners Incorporated at all, Brittany Moondyne, registered nurse, Oral argument as follows, 15 minutes for the plaintiff, 15 minutes to be shared by the defendant. Mr. Belsley for the plaintiff, appellant, cross, affidavit. Good morning. Good morning, your honors. May it please the court, counsel, with the court's I would like to reserve three minutes for rebuttal. Your honors, this is a case in which a young fellow, still a teenager, was admitted to the jail in Frankfort, Franklin County Kentucky, and over the period of six days vomited profusely to the point that on the sixth day he began to have seizures, had to be transferred and then airlifted to UK hospital because he had renal failure, lactic acidosis from such severe dehydration. He almost died. The reason this happened is two-fold. One, he was the responsibility of two organizations, first the jail and the jail staff, secondly Southern Health Partners and the medical staff in the jail. Let's talk about the jail first. The jail had a policy, a written policy, that was supposed to prevent this. The jail's written policy said that alcohol, drug withdrawal was a medical emergency and that when its officers, its deputy jailers, observed the signs and symptoms of alcohol and drug withdrawal, they needed to at least tell the nurse what they were seeing. In this case, the evidence demonstrated that the guards responsible and who were monitoring Mr. Griffith didn't even know the policy. The jailer didn't even know what training those officers had received in the policy and that to the contrary, what the practice was in the jail was that the deputy jailers would look in and check an inmate and merely for the purpose of confirming, and they said this repeatedly in their depositions, one after another, that the inmate was living, breathing flesh. If they weren't, then they would tell the nurse. As a consequence, the jailers were watching Mr. Griffith vomit over and over and over again. Six times in the first three hours he was in jail, 16 times in the first three days, but they never told the nurses. They dutifully logged it in an observation sheet. That's how we know how many saw him vomiting, but they never told the nurses and the nurses never looked at the observation sheet. That brings us to Southern Health Partners. Southern Health Partners has a written policy in place that is critical. It says, it's very specific about how a detoxing inmate's condition should be managed, and it requires the notification of a provider, a doctor or an APRN at the outset, and then their continued involvement in the management of that patient's condition. It also... Let me ask you, there was a detox unit he went into initially, correct? Yes, sir. For 48 hours? Yes. At the end of that period, he was not vomiting at that point, was he? Yes, he was, Judge. In fact, he stayed in the detox unit. He came in on a Sunday night. He stayed in the detox unit until Wednesday afternoon. On Wednesday afternoon, the officer's observation logs indicated that he was still vomiting. While he was in detox? While he was in detox. He was seen on Wednesday afternoon by one of Southern Health Partners, either an LPN or an RN. I need to double check that. But he was still complaining of vomiting and nausea. And they knew then, Your Honor, that he was at that point having trouble urinating, which created real concerns about dehydration. Despite that, Your Honor, the medical staff said, okay, take him off detox. Didn't they give him some medicine based on the urine sample? Well, Your Honor, they did. But this goes to the... This raises the issue of the limitations on an LPN's and an RN's scope of going through detox. Call a provider from the get-go. And even their protocol for nausea vomiting says that. Call a provider. It's because LPN's and RN's cannot diagnose or treat patient illness absent the supervision of a provider. They can't provide medical attention. So a provider was not called at any point while he was in detox? No. In fact, Your Honor, there was a practice that an APRN would visit the jail once a week. And the APRN, the evidence in this case, showed that the APRN visited the jail while Mr. Griffith was still in detox, while he was still vomiting, after the nurses, the LPN's and the RN's at the jail became concerned about dehydration because he was having trouble urinating. And because the APRN, when she would visit the jail, would only see those patients that the RN's or the LPN's diagnosed as meriting her attention, they didn't put Mr. Griffith on the list for her to see them. So he was never seen by an APRN or an LPN. In fact, Your Honor, the whole system at the jail, Southern Health Partners' whole system at the jail, was so devoid of any provider involvement that on Saturday, when Mr. Griffith started seizing the LPN on duty there, she calls, she makes a call. But when she makes the call, does she call an APRN? Does she call a doctor? No. She calls Ms. Shero, who's an RN, who is no more capable of making a diagnostic or treatment decision than the LPN is. But the registered practicing nurses could prescribe medicines and do some additional things that the licensed practical nurses could not do. Not really, Your Honor. When it comes to giving medicine, what they have is there's two sets of written documents, if you will, that Southern Health Partners provides its employees. And in this case, its employees are the LPNs and the RNs. It's their policies and procedures. And then they have protocols that says, for example, in this case, the policy and procedure talks at length about the importance to monitor somebody going through drug withdrawal or alcohol withdrawal, of which vomiting can be a symptom. The protocol says, it doesn't talk about detox, it doesn't talk about those things. It says, it tells the nurses, look, if an inmate presents at sick call and he's complaining of nausea and vomiting, the first thing it tells them to do is call a provider. What these nurses were doing was they weren't calling the provider, they were just going down the protocol. And that's wrong. First of all, it's a violation of the policy, it's a violation of the protocol. Second, it's got them diagnosing. They don't need to call a provider because they believe they know what's wrong with this young man. And as Mr. Griffith's case made clear, they clearly didn't. They knew, though they provided him medication, your honor, they knew because he continued vomiting and getting worse and worse and worse for six days, they knew it was ineffective. They knew it was ineffective. Yet one of the problems with the district court's decision below was that Judge Van Tatenhove said, we didn't have a federal case here because he wasn't ignored. Well, that's not, we don't have to show he was ignored. What are you contending that, yeah, the standard is, this is a 14th Amendment claim, correct? Yes, sir. Okay. He was a pretrial detainee. And you're contending that there should be a different standard for 14th Amendment versus the 8th Amendment? Well, in this case, your honor, Judge Van Tatenhove applied the objective unreasonableness test. Right. And we believe he was correct in applying objective unreasonableness by virtue of the court's decision in Kingsley that had everything to do with the presumption of innocence that attends a pretrial detainee and doesn't have anything to do with the fact that excessive force exercised by a police officer is subjected to when Judge Van Tatenhove applied the objective unreasonableness test. And we're in a very fluid situation here because we have the court's decision in Kingsley and we have different circuits talking about what objective unreasonableness means. Judge Van Tatenhove said, he said, we didn't have a federal claim, number one, because Mr. Griffith wasn't ignored, and number two, because he was not recklessly, the judge's term was recklessly endangered. Now, it's a very thin parsing we have going on between the circuit courts, and I believe Judge Van Tatenhove understandably, given the language being used, became confused. The Supreme Court in Kingsley told the district court when it remanded the case, it said don't instruct the jury on recklessness. That sounds like subjective intent and we don't want the jury to go there in an objective unreasonableness analysis. When the Second Circuit got a hold of Kingsley in the case of a pretrial detainee's medical claim, they said now there's objective recklessness, which is new or should have known, and then there's subjective recklessness where you have to prove intent. Well, that crossed the line again that the Supreme Court had drawn in Kingsley, but Judge Van Tatenhove asked the parties for briefing on the question of how the and I think where he went with that, your honor, was he went right back into subjective intent. Is there a particular circuit that you think has got it right? Your honor, I think the Ninth Circuit in Castro, but Judge Bush is a more practical matter. We're dealing here with a case, particularly when it comes to Southern Health Partners and its personnel, where we have proven, number one, violation of policy. Number two, we've got an expert, a qualified expert who has said they violated the standard of care and the LPNs and the RNs were in practice, and we have evidence that this wasn't a mistake. This wasn't inadvertent. This wasn't accidental. This wasn't a missed phone call. This wasn't somebody failing to see a yellow sticky trying to remind them to do something. This was what they did. This was how the jail operated. So I have intentional conduct. I've got more than just a policy violation. You said a whole lot about supervisory liability, the legal requirements there, and whether that applies. Again, your honor, let me take that from two perspectives. First, the jail, then Southern Health Partners. In the Shadrick case, Judge Strach's opinion in that case said, look, it's bad enough when the employees don't know the policy. When the supervisors don't know the policy, you've got a case for failure to train and supervise. And with regard to the jail, the employees obviously didn't know the policy. You've got an argument on a practice that constitutes a policy that constitutes a constitutional violation. But the jailer didn't know what training his employees received on the EMS policy. And their expert, the jail's expert said in deposition, when it comes to an emergency medical service policy, when you're talking about life and death issues, there's no excuse for not training, supervising, and knowing that your employees know and enforce that policy. When it comes to Southern Health Partners, Judge, you can look at Judge Strach's opinion in Shadrick because it goes straight to Southern Health Partners. That was a Southern Health Partners case. And that case was reverse sent back on Southern Health Partners for trial, deliberate indifference, failure to train and supervise, because none of the employees followed the policy. The RN, Ms. Chereau, was the head of the medical services unit at the jail, and she didn't know the policies or follow them. So it's just a continuous, this again, this is subsequent to Shadrick, trying to stop this stuff, but they keep doing it. You might want to wind up at this point. I'm done, Your Honor. Okay, thank you. May it please the court, Mr. Belsley, Mr. Ott, Ms. Brannon, my name is Barry Stills, and I represent the Franklin County defendants in this case. How are you all going to divide your time? I'm going to take six minutes, Your Honor. Mr. Ott's going to take six, Ms. Brannon's going to take three. It's going to be a very abortive argument I'm going to make, so I'm going to try to hit some of the high points, and I hope that you will pay attention to my briefs in this case more than my arguments, because I'm sure I will not be able to do a very good job in six minutes. A couple of things that Mr. Belsley takes liberty with on some of the facts in this case, they're on page 20, I believe it's 25 of our brief, it's shown that these deputies were trained on these policies and procedures, including the EMS policies and procedures. Mr. Belsley took Mr. Rogers' deposition, and that is Mr. Belsley's or Mr. Rogers' testimony, beginning on page 24 of our brief, where these officers are given 80 hours of training, including going over the policies and procedures, which includes the EMS policy. Also, they're given 16 hours at that time, annual training in Kentucky for jail guards, that's now gone up to 24 hours, but at this time I believe it was 16, and that includes going over these policies. So it's just an absolute mischaracterization of the record that these officers weren't trained. Okay, but how do you explain that all the officers are saying that they were just in need to keep the inmates living, breathing flesh? That was their interpretation. There's no proof that Mr. Rogers knew that was going on. There's no proof that the Franklin County magistrates knew that was going on. That's another mischaracterization of their testimony, Judge Bush. If you look over on paragraph 3 or page 22 of our brief, in a footnote we say that that's not what they were doing. If they witnessed anything abnormal, chest pains, lightheadedness, excessive vomiting, seizure, profuse bleeding, they would indicate and call and tell the nursing staff. This is not a situation where Mr. Griffith was in a detox cell for three days with nobody looking at him. He was in fact seen by the SHP staff the next day he was in there, like six hours after he got in there. They started administering whatever they were doing to him. In fact, he was seen twice a day during his detox by a nurse for SHP. That was part and parcel of the regiment here. And also, once he went out from detox, it's not like he continually had a medical issue for six straight days, like Mr. Belsley characterizes. Three days went by with no problems. No medical slips were tendered. In fact, the medical slips that Mr. Griffith testified, he knew how to fill out a medical slip, he knew where to get it, and he gave it two or three times while he was in detox, and he was seen every day that day by SHP. What about his contention of vomiting? I had the impression at the end of his detox unit stay, he was still vomiting at that point. Is that in the record? I don't, if he was, it had not been since probably three or four hours before he left detox. He didn't have a seizure until three days later while he was in general population, has one seizure, he's immediately attended to. Is there a policy as to how long prisoners typically kept in detox if he's suspected of withdrawing from detox? Usually it's 48 hours, but it can be longer. It just depends on the person. This case, the case why we brought a cross appeal in this case, I want to touch on that very briefly. I'm starting to run out of time, which I think this is a major issue. We believe that Judge Van Tatenhove applied the wrong standard in this case. Kingsley should not apply in the case of pre-trial detainee medical needs case. Should there be a different standard for the 14th amendment versus the 8th amendment for medical needs? No, there shouldn't. How do you deal with the fact that there's different wording, there's punishment involved in the 8th amendment, but not for the 14th amendment? You're entitled to a basic human need, both parties are entitled to a basic human need whether they're convicted or not convicted. There's no difference in that. The fact there's been a lot made of this case, the fact that 6th circuit has not addressed this, whether Kingsley applies in this situation. I would take exception to that. I was involved in the case in 2018 up here called Winkler, which is a case to medical needs cases. That case, after it was decided, 35 page opinion was rendered. The plaintiffs made a motion for an en banc hearing that raised one issue, Kingsley versus Hendrickson, that it ought to apply. And that panel denied it and there was not a judge on this circuit that agreed to re-hear it en banc. And since that time, the 6th circuit has continually applied Farmer versus Brennan to these kind of cases, including late as of last week involving a case with my co-counsel Ms. Brannon and Mr. Belsley, a case called Daniel Martin versus Warren County, where Farmer versus Brennan was still applied in that case. That's the mistake we think is made. We think the case should be affirmed under any standard, but because of this continual problem of which standard to use, we believe the Kingsley case should be cabined to its holding and its holding is with regard to excessive force claims and excessive force claims only, not inadequate medical attention. Yes sir, I did. Thank you very much for your consideration and we hope that you will affirm this case. Thank you. Good morning, your honors. Robert Ott for Southern Health Partners and I represent two of the nurses as well, Heather Griffith in the early part of his stay. I do take issue with a number of arguments put forth by Mr. Belsley. First of all, the whole issue of detox. There is not evidence that Mr. Griffith was detoxing and I think that has been set forth that Mr. Griffith showed up at jail and was going through withdrawal. There's no evidence of that. He was put in a detox cell. Why was he vomiting? What did the nurses think when they saw him vomiting? Stomach bug, your honor. In fact, Mr. Griffith himself testified that he felt it was nerves. He was scared that night when he got there. He was a young kid. He's 18 years old. He calls mom. He's crying. He's evaluated by mental health that evening and they put him on two separate sick calls. He puts a sick call slip in on the 9th. He's immediately seen by Ms. Trevette. She does vital signs. She checks his skin. She reviews his hydration with him. Everything looks okay. He puts another slip in on the 10th. Same thing. She reviews his vital signs, reviews his hydration, reviews something called skin toner. You'll see that in the brief and in some of the briefs. And she reviews his hydration with him once again. We don't see him after the 11th. That's on the 11th. We don't see him after that. I'm sorry, that's the 10th. We see him on the 11th where we give him Gatorade. Although he did complain he couldn't void on the 10th, he did void in a cup on the 11th and was offered Gatorade. We don't see him after that. He knows how to put a sick call slip in. He doesn't put one on the 10th. Were the nurses trained to do any kind of analysis of the urine sample? They cannot do analysis of the urine sample. The intent of that was for a nurse practitioner who is a higher level to come see him on her weekly visit and review that urine sample. Okay, and that was sent to a nurse practitioner? She eventually signed off on it, but by then Mr. Griffith was gone out of the jail. So it was too late? It was, Your Honor. If you assume that urine sample showed anything, and it's my contention, it doesn't show any abnormalities and it certainly doesn't show that Mr. Griffith was dehydrated. My experts were not the Poe's in this case, but they would have testified that the urine sample does not show dehydration. In fact, it shows the opposite of that. There is no causal link between his acute kidney injury when he was sent to the ward of dehydration. Mr. Griffith's own experts couldn't put those two things together and was specifically asked that. I do want to touch... How was he put into the general population when he was vomiting like three to four hours before he was released from detox?  He was re-evaluated by psych, and that's what put him into observation. But it's not just psych, it's physical condition. He is having physical conditions, but his vomiting had decreased by the 11th, and in fact by the 12th he's at the canteen. And he's buying Sprite, he's buying Dr. Pepper, he's buying tuna with chili, and he's buying noodles. While he's in... This is right after he's released from detox? The day after, Your Honor. He's released from detox on the 11th, by the 12th he's at the canteen, and he's buying all kinds of products, and not putting in sickle slips. This is not the face of somebody who's suffering acute dehydration to the point he's going to suffer an acute kidney injury. This is someone who's fine, who's at the canteen, who's buying a number of goods. What caused his seizure? I have no idea. I don't know. There's been nuggets, if you will, of potential ingesting of illegal substances, such as synthetic marijuana. There was comments made in some of the UK and Frankfurt regional records alluding to that. I don't know what caused the seizure. I don't think anybody can say that any sort of dehydration at the jail causes acute... Nurses you represent were involved after he left detox in treating him? They saw him on the 11th. They did not see him on the 12th or 13th. He was seen by Ms. Mundine, Nurse Mundine, who Ms. Brandon represents, on the 14th during the seizure. So your nurses were just involved during the detox? Yes, sir. My nurses saw him on four observation periods, and on two separate sickle periods, where he put a sickle slip in, and then they saw him, and there's one other progress note where they do the urinalysis. This is on the 11th. They check his vital signs, and they offer him Gatorade. I want to touch very briefly, as Mr. Stills did, on the standard. I think summary judgment ought to be affirmed as to my clients. I don't think the court got the standard right. I think the farmer standard is the standard that ought to apply. I think from a basic health care need, a basic human need, which is what medical care is, there should be no difference between a pretrial detainee and somebody who's convicted. I don't think that standard should be different. To take this to an objective standard of unreasonableness, which is what a plaintiff or appellant would have you do, you're basically constitutionalizing every single medical care tort, is in essence what's happening. With that, Your Honor, I'm out of time. Thank you very much. Thank you. Good morning, Your Honors. Good morning. I am Jane Brannon. I have three minutes. I'm representing Brittany Mundine, who is one of the nurses employed by Southern Health Partners. As a preliminary matter, before I leap to the Kingsley standard, it's important to recall that the district court granted summary judgment on the basis of no verifying medical evidence of any harm to Mr. Griffith. So regardless of the standard applied, my client is entitled to summary judgment on the basis of the fact that there is absolutely nothing that ties any action or inaction of my client to any harm to the plaintiff. I believe your opposing counsel made the argument that the nurse didn't review the notes that the prison guard had written about his condition. Actually, Your Honor, if you will read through Mr. Belsley's brief, you'll see that what he does over and over is he conflates all of the nurses as if we are one organization. So he does not establish any individual action on behalf of, any individual violation on behalf of Nurse Mundine. So Nurse Mundine had no reason to review any logs or anything with respect to Mr. Griffith when she arrived at the jail because there was no sick call slip. He was no longer in any special cell. He's out in general population. The first thing that my client- She doesn't, it's not part of her duties to review the condition of every inmate in the jail. No sir. There are 500, 600 inmates at the jail. She comes in- You have to have a kite. You have to have some sort of kite. It has to be brought to you by a deputy. There has to be some reason why- If there is someone who is in a particular type of cell, like a detox cell or suicide watch, then there are protocols that say when a nurse is supposed to go see them. So yes, you wouldn't necessarily have a kite for that. But in the absence of that, there's no reason for Nurse Mundine to even know that Mr. Griffith is there. And there was no kite here. And there was no kite. The first thing that she knew about it was this first- How many days was she involved in the care? She was there only the one day that- Well, she was there for two days that he was an inmate. The only time she saw him was the day that he seized and she sent him out. So she saw him for approximately two hours. There's a seizure. She responds to the cell. She brings him to medical. She spends 45 minutes to an hour assessing him, reevaluating him. He, for want of a better term, comes back to himself, requests to be sent back to the cell. She sends him back to the cell. After she's done med pass, she comes back to review his chart, at which point there's a second seizure and she sends him out. So there's absolutely nothing that shows that anything that she did or could have done would have prevented the seizure or would have mitigated any of the damages that occurred after that. Well, you know, he had more than one seizure. He had two, Your Honor, yes. Why didn't she have a duty to transfer him to the hospital after his first seizure but instead she sent him back to Nurse Chereau, which meant that there was a delay that he encountered before the second seizure? She could have sent him to the hospital. So why wasn't there a dereliction by her? Well, there's absolutely no expert evidence that demonstrates that every seizure needs to be sent out. And quite frankly, lots of inmates have lots of seizures that do not result in any treatment that needs to be done outside of what Ms. Mundine did. And we had, once again, Mr. Belsley did not depose any of our experts. We have a correctional health care nurse who says that this was within the standard of care. And I would take exception with the characterization of Ms. Mundine sending him or calling Nurse Chereau as opposed to sending him out as if that is any different from me walking down the hall in my law firm and saying, hey, I've got this case. What do you think about it? These are the things I've done. Can you think of anything else I should do? She's not deferring to Ms. Chereau's decision with respect to shipping him out. She's just asking her, these are the five, six, eight things I've done in response to this seizure. Do you think I'm missing anything? If I could. Well, actually, you're out of time. Oh, rats. There's absolutely no reason to differentiate between pretrial detainees and convicted prisoners with respect to medical needs, Your Honor, because it is a basic human right. You don't get any more rights to a basic human deed because you're a pretrial detainee. The status is indifferent. So the cases of excessive force are inapplicable here. Thank you. All right. Thank you very much. We do have rebuttal. Yes, Your Honor. You're not required to take it, but you can. Let me just ask you real quick. Do you agree that the standards should be the same between the Eighth Amendment and the Fourteenth Amendment? No, absolutely not. And why do you think pretrial detainees should get more health care than people that are in prison? Well, because they've got a presumption of innocence, Your Honor. The reason the deliberate indifference standard. So you believe that people that go to prison should get reduced health care from people that are out of prison? Your Honor, people that have been convicted and found guilty of a crime are going to be punished. There's a recognition of that. And Eighth Amendment says we recognize some punishment is appropriate but not cruel and unusual punishment. So because of that distinction, the court has all, in Farmer and then Estelle v. Gamble, well, I got that reversed, Estelle first and then Farmer, said you've got to prove that the punishment is unreasonable when it comes to a convicted prisoner. And so to do that, you've got to show deliberate indifference, subjective intent. But the Supreme Court in Kingsley was very clear that when it comes to a pretrial detainee as to whom no decision has been made as to whether they warrant punishment or not, it has to be an objective unreasonableness standard. What's even more interesting is they make that distinction in an excessive force case. In an excessive force case under the Eighth Amendment, you have to prove more than deliberate indifference. You've got to prove that the conduct was malicious and sadistic because it's oftentimes split second and an officer is trying to decide what to do. When it comes to medical people, you just have to show deliberate indifference. And that's because they have training. They have time to consider their actions, their conducts, and the consequences. Now, the defendants in these cases continue to conflate LPN, RN care with medical care. You heard Mr. Ott say they took his temperature, they did this, they did that. When I question these LPNs and RNs in deposition, I always ask them, and they say, we cannot diagnose and treat. All we can do is we can take vital signs, we can take objective and subjective complaints and symptoms, and we pass that on to somebody who can give medical treatment. A diagnosis and a decision as to how the person can be helped. For defendants to acknowledge that there's no telling, nobody over the course of six days ever determined what was causing this young man to vomit is stunning. Now, there are a lot of factual issues that need to be resolved by a jury. The nurses said they didn't know how often he was vomiting. They could have looked at the observation logs and determined that. The jailers said they didn't tell the nurses because, in their opinion, this profusion of vomiting was no different than what goes on with a lot of the people that come into their jail and detox. That's a jury issue. What happened in the last three days is a jury issue. Your Honor, you raised the issue of the release into general population. When that was done, Nurse Trevette thought Mr. Griffith needed to be monitored. He needed to be put in what's called a dry cell to determine how much fluid he was taking in. There was no dry cell available. She shrugged her shoulders. He wasn't monitored at all. Our experts say you've got to monitor. You can't leave it on the back of some terrified 18-year-old kid to make a complaint to get the medical care, particularly after it's been refused. Your Honor, we'd ask you all to reverse and remand for a trial. Thank you, Your Honor. Thank you very much, and the case is submitted. There being no further cases for argument, court may adjourn.